IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION


DYNASTEEL CORPORATION, )
)
Plaintiff/Counterclaim Defendant, )
)
vs. )     Case No. 08-0602-CV-W-ODS
)
BLACK & VEATCH CORPORATION, )
)
Defendant/Counterclaim Plaintiff. )


ORDER AND OPINION (1) DENYING DYNASTEEL'S MOTON FOR SUMMARY
JUDGMENT, AND (2) GRANTING BLACK & VEATCH PARTIAL SUMMARY
JUDGMENT


Pending is a motion for summary judgment filed by DynaSteel Corporation
(DynaSteel) (Doc 109). The motion is denied. In its suggestions in opposition to
DynaSteel's motion, Black and Veatch Corporation (B&V) requests partial summary
judgment on an issue of liability. This request is granted.


I.  BACKGROUND


On February 14, 2006, DynaSteel, a corporation with its principal place of
business in Memphis, Tennessee, contracted to supply labor, services, and materials,
including ductwork and limestone silos, to B&V, a company located in Kansas City,
Missouri, for the "Cardinal Units 1 & 2 FGD Retrofit Project" in Brilliant, Ohio. American
Electric Power Service Corporation (AEPSC) was the owner on the project. Through
subsequent revisions, the purchase price of the B&V/DynaSteel contract totaled
$11,721,714.95.

An issue with DynaSteel's performance arose after the initial duct sections were
scheduled to be delivered. On August 22, 2006, B&V notified DynaSteel that it would
be assessing charges against DynaSteel's account ("backcharges") for failing to install

safety cables on several duct pieces. That same day, B&V authorized one of its subcontractors, Aker Kvaerner Songer, Inc. (AKSI) to install the missing safety cables. On August 23, 2006, B&V sent DynaSteel a "Backcharge Notification" estimating the cost of the backcharge to be $4,125.00.

Tension between the parties surfaced as DynaSteel's performance continued. In September 2006, B&V backcharged DynaSteel for the alleged failure to provide base plates for several duct pieces. At a meeting held later that month, DynaSteel reportedly denied fabricating duct pieces with field splice joint gaps B&V claimed were too large. Despite DynaSteel's denial of liability, B&V backcharged $16,875.00 for this alleged defect. In October 2006, B&V reportedly "threat[ened]" to impose liquidated damages against DynaSteel, apparently due to delayed ductwork shipments. According to B&V, it ultimately decided against the liquidated damages because DynaSteel threatened to stop fabrication altogether if they were imposed.

DynaSteel delivered all the ductwork to the project site by March 19, 2007. In a letter dated June 7, 2007, B&V advised DynaSteel that it had "completed partial installation and inspection" of DynaSteel's work and had discovered defects and/or nonconformities. Included with the letter was a "Backcharge Log" listing twenty-four backcharges estimated to cost DynaSteel $789,573.46. B&V's correspondence also included an "Other Defects Log," identifying various other alleged defects or nonconformities with a total estimated repair cost of over $1,000,000.00. In a brief response dated June 13, 2007, DynaSteel wrote, "Concerning your letter dated June 7, 2007, DynaSteel Corporation disagrees with its content and therefore rejects it in it's [sic] entirety. Please release for payment all monies due under the contract." Thereafter, B&V continued to assess additional backcharges against DynaSteel and refused to pay DynaSteel the full purchase price.

DynaSteel filed this action in federal court against B&V, asserting claims for breach of contract, quantum meruit, and declaratory relief, and seeking to recover attorney fees and a prompt payment penalty under Mo. Rev. Stat. § 431.180. According to DynaSteel, "at least $1,429,680.73" of the purchase price remains due and owing from B&V. B&V counterclaimed, asserting causes of action for breach of contract

and breach of warranty.  According to B&V, it owes B&V nothing; rather, B&V claims DynaSteel owes *it* $3,433.79.00 for corrections or repairs B&V's subcontractors were required to perform on DynaSteel's allegedly defective and nonconforming work. DynaSteel maintains B&V is completely barred from any recovery.

## II.  DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Reynolds v. RehabCare Group East, Inc.*, 591 F.3d 1030, 1032 (8th Cir. 2010).  DynaSteel's arguments in its motion for summary judgment can be grouped into six categories, which the Court will address in turn:  (1) Notice; (2) Liquidated Damages; (3) Inspection Costs; (4) Design Change Notifications; (5) Approval of Drawings; and (6) Insulation Saturation.

### 1.  Notice

DynaSteel claims that B&V cannot hold it liable for the work performed in correcting the alleged defects and nonconformities because B&V failed to provide it notice and an opportunity to cure prior to performing the corrective work and backcharging DynaSteel for the incurred costs.  According to DynaSteel, B&V failed to provide it the notice required by the Missouri Uniform Commercial Code–Sales (U.C.C.). In addition, DynaSteel claims that, under the contract, notice and an opportunity to cure were conditions precedent to DynaSteel's liability for B&V's corrective costs and backcharges.  DynaSteel's arguments do not entitle it to summary judgment.

### (a) U.C.C. Notice

DynaSteel contends that the U.C.C. notice requirement found at Mo. Rev. Stat §

400.2-607(3)(a) bars B&V's recovery. This argument was raised for the first time in Dyansteel's reply brief. The Court declines to consider an argument raised for the first time to which B&V does not have an opportunity to respond. *See U.S. v. Barraza*, 576 F.3d 798, 806 n.2 (8th Cir. 2009) (citation omitted) ("Arguments raised for the first time in a Reply Brief need not be addressed."). Justice requires that B&V be allowed to argue against the application of the U.C.C. and its remedy-limiting provisions. DynaSteel is not entitled to summary judgment on this issue.

Even if the Court assumed, without deciding, that Mo. Rev. Stat. § 400.2-607(3) applied, DynaSteel still would not be entitled to summary judgment. In relevant part, Mo. Rev. Stat. § 400.2-607(3) states:

> (3) Where a tender has been accepted
>
> (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

The sufficiency of notice and what is a reasonable time within which to give notice of defective goods are ordinarily questions of fact for the jury. *See Rowe Intern., Inc. v. J-B Enterprises, Inc.*, 647 F.2d 830, 833 (8th Cir. 1981). Here, DynaSteel relies on evidence that merely *suggests* B&V performed receipt inspections all DynaSteel's work and should have know of defects–its evidence does not prove these facts as a matter of law. Nor does DynaSteel's evidence conclusively establish the scope of any inspections performed, precluding the Court from ruling that B&V necessarily had–or should have had–notice of any particular problem on a particular date. DynaSteel has not shown that B&V violated the U.C.C. as a matter of law.

### (b) Contractual Notice

Missouri common law provides a purchaser the right to repair defective or nonconforming work and to recover the costs of repair from the supplier. *See Stom v. St. Clair Corp.*, 153 S.W.3d 360, 364 (Mo. Ct. App. 2005) ("'[T]he non-breaching party is

entitled to the cost of repairing or replacing the defective work.'"). The right to recover the costs of repair is also available under the U.C.C. *See* Mo. Rev. Stat. § 400.2-714(2) (providing remedies for buyer that accepts nonconforming goods); *Davis Indus. Sales, Inc. v. Workman Const. Co., Inc.*, 856 S.W.2d 355, 360-61 (Mo. Ct. App. 1993) (holding that cost to repair forklift was proper measure of damages under § 400-2-714(2)). In its contract with DynaSteel, B&V expressly retained the remedies to which it is entitled under Missouri law. Article 00512.29.1 states in relevant part:

> 00512.29.1  *All rights and remedies of Purchaser set forth in this Purchase Order or existing at law or in equity shall be cumulative and may be exercised concurrently. Without limitation*, Purchaser's remedies under this Purchase Order shall include the following:
>
> (a)  If Purchaser rejects any or all of the Goods, the Goods may, at Purchaser's option, be returned to Supplier . . . .
>
> (b)  If Purchaser elects to accept defective or nonconforming Goods, all costs and expenses incurred by Purchaser in connection with such election, including those incurred as a result of the modification or alteration of the Goods necessary to make the Goods conforming, shall be to Supplier's[1] account.

(Emphasis added).

Significantly, the contractual language DynaSteel relies upon in making its notice argument applies only to the contractual remedies "set forth" in Article 00512.29.1. This language is found in Article 00512.29.2, which immediately follows Article 00512.29.1 and which states in relevant part:

> 00512.29.2  *Notwithstanding Purchaser's remedies set forth above* . . . Purchaser may correct such defect or nonconformity and all costs therefore shall be to Supplier's account . . . provided, however, that Purchaser has given written notice thereof to Supplier and afforded Supplier an opportunity to correct the defect or nonconformity in the Goods . . . .

---

[1]  DynaSteel is the supplier under the agreement.

(Emphasis added).  The very first clause of Article 00512.29.2 declares that its provisions apply only to *contractual* remedies–those "*set forth*" in the contract. (Emphasis added).  Reading this clause in conjunction with Article 00512.29.1, the Court holds that even if DynaSteel were correct that notice and an opportunity to cure are conditions precedent under Article 00512.29.2, this would not bar B&V from recovering its costs for corrective work pursuant to the legal remedies it retained.  *See State ex rel. Missouri Highways and Transp. Com'n v. Muslet*, 213 S.W.3d 96, 99 (Mo. Ct. App. 2006) (citation omitted) ("[U]nless the contract expressly or by implication states that a remedy is exclusive, it is to be considered permissive as opposed to exclusionary.")  DynaSteel has not shown that B&V is precluded from recovering its costs for corrective work as a matter of law.

Moreover, even if B&V's recovery was tied solely to the remedies set forth in the contract, DynaSteel still would not be entitled to summary judgment on its notice argument.  In full, Article 00512.29.2 states:

> 00512.29.2  Notwithstanding Purchaser's remedies set forth above, if any defect or nonconformity in the Goods is discovered by Purchaser after the Goods have been delivered to the Jobsite but prior to the commencement of the Warranty Period, and if:  a) Supplier fails to correct such defect or nonconformity within three calendar days after Purchaser gives Supplier notice of such defect or nonconformity; or b) in the case of emergency, where in the reasonable judgment of Purchaser, delay could result in serious loss or damage to persons or property; or c) in the event that Purchaser at its sole discretion determines that the requirements of the Project schedule would be adversely affected if the correction of such defect or nonconformity is not performed prior to the expiration of the three day period, then Purchaser may correct such defect or nonconformity and all costs therefore shall be to Supplier's account pursuant to Article 00512.36 [backcharges] hereof, *provided, however, that Purchaser has given written notice thereof to Supplier and afforded Supplier an opportunity to correct the defect or nonconformity in the Goods within the time reasonably determined by Purchaser to be required under the provisions of this Article 00512.29.2.*

(Emphasis added).  As the following discussion illustrates, there are genuine issues of

material fact whether notice and an opportunity to cure were required under Article 00512.29.2.

First, by its terms, Article 00512.29.2 only applies if B&V discovered the alleged defects or nonconformities after the goods were delivered to the jobsite but prior to the commencement of the "Warranty Period."[2]  Neither in its Statement of Uncontroverted Material Facts nor in its briefing does DynaSteel address whether B&V's discovery of the alleged defects occurred within this window of time.  The Court notes that B&V has not argued *against* this window of time being met, but without conclusive evidence that the backcharges arose out of this time frame, the Court cannot determine in this issue in DynaSteel's favor.  DynaSteel did not put forth uncontroverted evidence proving this fact, and it is not entitled to summary judgment.

In addition, even if it was established that the window of time under Article 00512.29.2 was met, DynaSteel still has not shown that it was entitled to notice and an opportunity to correct as a matter of law.  DynaSteel claims that notice and an opportunity to cure were conditions precedent to B&V's backcharges.  "'A condition precedent denotes an event, which qualifies a duty under an already enforceable contract.'" *Jetz Service Co., Inc. v. Botros*, 91 S.W.3d 157, 162 (Mo. Ct. App. 2002) (citation omitted).  "Although it is not always the case, conditions precedent are usually introduced by conditional language such as 'provided that' or 'on condition.'" *James E. Brady & Co., Inc. v. Eno*, 992 F.2d 864, 869 (8th Cir. 1993) (citation omitted) (emphasis added).  Here, Article 00512.29.2 allowed B&V to perform corrective work and backcharge its costs to DynaSteel "provided, however, that" B&V gave the requisite notice and opportunity to cure.  Paraphrasing Article 00512.29.2, B&V was required to give DynaSteel notice plus 3 calendar days[3] to correct a defect or nonconformity

---

[2]  The contract defines "Warranty Period" as "a sixteen month period of time after the Project Substantial Completion Date . . . ."  Article 00512.2.  The Court was not provided sufficient evidence to determine when the Warranty Period began.

[3]  In addition to this 3-day notice, DynaSteel claims B&V was required to give it an additional 5-day notice under Article 00512.36.1, which allowed B&V to perform work and backcharge DynaSteel in the event that DynaSteel indicated that it was unwilling or

*except* (1) in an "emergency" where B&V reasonably adjudged that "delay could result in serious loss or damage to persons or property," or (2) when B&V, in its sole discretion, reasonably determined that the Project schedule would be adversely affected if the corrective work was not performed prior to expiration of the 3-day period. Significantly, DynaSteel's argument fails to even acknowledge these exceptions. Moreover, B&V has presented evidence tending to show that they might apply. The factual issue whether DynaSteel was entitled to notice and an opportunity to cure under Article 00512.29.2 is a question must be decided by a jury. DynaSteel is not entitled to summary judgment.

Although the Court agrees with B&V that DynaSteel is not entitled to summary judgment on its contractual notice argument, the Court does not find all of B&V's arguments on this issue persuasive. For example, B&V maintains that even if notice within a specific period of time was required under its contract with DynaSteel, failure to provide such notice was inconsequential where reasonable notice was otherwise provided. However, the case B&V cites for this argument, *Trinity Products, Inc. v. Burgess Steel, L.L.C.*, 486 F.3d 325, 330-32 (8th Cir. 2007), held that a provision in a purchaser/supplier contract requiring 5-day notice for "'incorrect material'" was factually inapplicable and did not bar purchaser's action against supplier. *Id.* at 330-32. *Trinity Products* does *not* hold that a party may completely ignore an applicable notice provision in a contract and still recover for breach by providing notice that may be deemed reasonable. *Id.* Moreover, the analysis in *Trinity Products* involved the Eighth Circuit's application of multiple U.C.C. provisions–statutes which B&V conspicuously fails to address. *See id.* B&V's analysis of *Trinity Products* is wanting and its reliance on this case is misplaced.

Another unpersuasive argument B&V makes is that DynaSteel is liable for backcharge costs under the contract "irrespective of any notice." In support of this claim, B&V cites to contractual provisions authorizing it to backcharge DynaSteel for

___

unable to proceed. However, unlike Article 00512.29.2, Article 00512.36.1 does not specifically apply to corrective work nonconforming goods and does not apply to B&V's backcharges.

8

corrective work, highlighting that these contain no notice requirement. However, B&V notably fails to cite Article 00512.29.2, which specifically *does* require notice and an opportunity to cure under certain circumstances.[4] B&V's argument also cites Article 00512.6, which permitted B&V to withhold payment to DynaSteel pending resolution of any backcharges, claims, or other disputes arising under the agreement; however, this Article does not invalidate Article 00512.29.2. Lastly, B&V cites to Article 00512.41.1, which obligated DynaSteel to indemnify B&V from any liabilities, costs, and claims. However, at least one Missouri court has held it to be "manifestly unreasonable" to excuse a purchaser's untimely backcharges based solely on a supplier's contractual duty to indemnify the purchaser. *See American Laminates, Inc. v. J.S. Latta Co.*, 980 S.W.2d 12, 16 (Mo. Ct. App. 1998). The Court rejects B&V's contentions.

B&V also argues that even if it failed to provide notice and an opportunity to cure under Article 00512.29.2, DynaSteel cannot use this omission against B&V unless it can prove it was damaged by the lack of notice. The Court disagrees. Although "Missouri law does not favor conditions precedent," *Union Elec. Co. v. Southwestern Bell Telephone L.P.*, 378 F.3d 781, 788 (8th Cir. 2004), courts construe contract provisions to be conditions precedent when required to do so by "'plain, unambiguous language or by necessary implication,'" *BJC Health System v. Columbia Cas. Co.*, 478 F.3d 908, 913 (8th Cir. 2007) (citations omitted). Here, the language of Article 00512.29.2 permitted B&V to backcharge DynaSteel for corrective costs "provided, however, that" B&V gave DynaSteel notice and a 3-day opportunity to cure (with two exceptions). Assuming neither exception applied, Article 00512.29.2 unambiguously established notice and an opportunity to cure as conditions precedent to B&V's authority to perform corrective work and backcharge DynaSteel. Contrary to B&V's argument, DynaSteel is

---

[4] In making its argument here, B&V's reasoning solely relies on the contract language and does not cite to any facts–disputed or otherwise–that an emergency existed or that the schedule would have been adversely affected by allowing the 3-day opportunity to cure.

not required to prove that it was damaged by the absence of notice.[5]

B&V's next attempt to defeat DynaSteel's notice argument relies on the concept of mitigation. B&V cites to the affidavit of Reed (B&V's Senior Project Manager), who claimed that "[o]n a pass through basis DynaSteel was exposed to $70,000 per day delay liquidated damages for each day the project was late due to its fabrication defects and the resulting repairs." B&V asserts that by acting promptly to correct DynaSteel's defects, B&V shielded DynaSteel from these liquidated damages and mitigated DynaSteel's exposure. However, B&V cites to nothing in the parties' contract authorizing pass through damages, and any such provision would be subject to the Court's interpretation, not Reed's. B&V's argument is unsupported and not persuasive.

B&V's final notice argument relies on *Stacey v. Redford*, 226 S.W.3d 913, 918 (Mo. Ct. App. 2007), which holds that written notice required by a contract may be unnecessary where providing notice is a "vain and useless act." (Citations omitted). To establish that notice to DynaSteel was a useless formality, B&V provides examples where DynaSteel–when advised of backcharges–promptly disputed or refused to accept them and refused to make repairs. DynaSteel counters with facts that it claims justify its responses. Detailing the parties' considerable back-and-forth evidence on this issue would serve no purpose except to show that the question whether notice to DynaSteel was reduced to a useless gesture is a factual one that will need to be resolved by the jury. Inasmuch as B&V is requesting the Court to rule as a matter of law that notice to DynaSteel was a vain and useless act, that request is denied. The issue of what notice was required to be provided DynaSteel must be tried to the jury.

### 2. Liquidated Damages

---

[5] B&V points to another provision in the contract where the words "condition precedent" were used, arguing that the absence of these words from Article 00512.29.2 establishes the parties' intent not to form a condition precedent. B&V's interpretation fails to give full effect to the unambiguous language in Article 00512.29.2 and is rejected. *Rabius v. Brandon*, 257 S.W.3d 641, 646-47 (Mo. Ct. App. 2008).

Article 00512.36.3 of the contract states, "All direct costs incurred in performing the Backcharge Work will be backcharged to Supplier . . . . *In addition, an allowance of twenty-five percent of the direct cost will be added for Purchaser's overhead, supervision, and administrative costs.*"  (Emphasis added).  Notably, the 25% markup of direct backcharge costs applies *only* to B&V's contractual backcharge remedy; Article 00512.36.3 does not apply to B&V's legal remedy to recover costs for corrective work under the common law or the U.C.C.

DynaSteel claims that the 25% markup in Article 00512.36.3 is an unreasonable liquidated damages clause.  The Court does not agree.  "Courts look with candor on provisions deliberately entered into between parties, and do not look with disfavor upon liquidated damage stipulations."  *Germany v. Nelson*, 677 S.W.2d 386, 388 (Mo. Ct. App. 1984) (citing *Southwest Engineering Co. v. United States*, 341 F.2d 998, 1001, *cert. denied*, 382 U.S. 819 (1965)).  A liquidated damages clause is valid in Missouri if (1) the amount fixed as damages is a reasonable forecast for the harm caused by the breach, and (2) the harm that is caused by the breach is of a kind that is difficult to accurately estimate.  *Information Systems and Networks Corp. v. City of Kansas City, Mo.*, 147 F.3d 711, 714 (8th Cir. 1998).  Here, the harm caused by DynaSteel's breaches (assuming they occurred) is of the type that is difficult to estimate because there are some overhead, supervision, and administrative costs that B&V would have incurred irrespective of the repairs, and it would be difficult to discern which expenses were a direct consequence of DynaSteel's breaches.  Moreover, overhead, supervision, and administrative expenses are types of costs that can be particularly difficult to accurately estimate, and the 25% markup is a reasonable forecast of the expenses B&V would incur by having to perform corrective work.  Most significantly to the Court, DynaSteel is a sophisticated business that freely negotiated its contract with B&V and agreed to the 25% markup.  DynaSteel has shown no valid reason why it should be released from its agreement.

DynaSteel also claims that B&V already recovered its administrative, supervision, and overhead costs when it was paid by AEPSC, so it should be barred from recovering these expenses from DynaSteel.  There is no proof that B&V's contract with the owner

11

included expenses for corrective work to be performed on DynaSteel's goods. This argument is meritless.

### 3. Inspection Costs

After B&V allegedly discovered defective seal welds which permitted water to leak in "Unit 1" and "Unit 2" ductwork, B&V engaged in a full scale inspection to determine whether remaining seal welds were also defective. Although B&V's examination revealed additional allegedly defective welds, some of the seal welds passed inspection. Other scenarios occurred with allegedly defective lifting lugs and strap plates. In each instance, B&V is seeking to recover from DynaSteel some of its costs for specification compliance inspections that did not reveal defective work. DynaSteel contends the contract prohibits B&V from doing recovering these amounts. The Court does not agree.

Article Q001.1.6, captioned "**Receipt Inspection**," states:

> Materials or equipment purchased under this purchase order may be inspected at the specified receiving points and will either be accepted or rejected. Inspection will include the necessary testing for determining compliance with the specifications. All expenses for initial acceptance tests will be borne by the Purchaser. The expenses for subsequent tests will be charged against the Supplier if due to initial test failures.

This provision demonstrates the parties' intent that DynaSteel shoulder the costs of reasonable inspections ordered by B&V in response to initial concerns with the DynaSteel's work. *See Lueckenotte v. Lueckenotte*, 34 S.W.3d 387, 395 (Mo. banc 2001) (citations omitted) (noting that primary rule in interpreting contract is to ascertain parties' intent and then give effect to that intent). To the extent that B&V's inspections of the seal welds, lifting lugs, and strap plates were reasonable, B&V was justified in conducting them at DynaSteel's expense under Article Q001.1.6.

DynaSteel disputes this conclusion, noting first that the issues with the allegedly defective seal welds and lifting lug welds arose well after the duct sections had been

accepted by B&V.  Since Article Q001.1.6 literally refers only to testing conducted when the ductwork arrived at the "specified receiving points," DynaSteel reasons that this Article cannot justify B&V's weld inspection costs.  However, DynaSteels' narrow reading elevates the form of Article Q001.1.6 over its substance.  The intent of this Article to provide B&V the right to charge DynaSteel for inspecting the duct pieces when B&V was reasonably alerted that there may be defects or nonconformities.  DynaSteel's narrow interpretation of Article Q001.1.6 is rejected.

DynaSteel also contends that Article Q001.1.6 does not justify B&V's weld inspection costs (which included the lifting lug issues) because another, more specific, contract provision governs the testing of welds.  DynaSteel cites Article Q100.7, captioned "**Nondestructive Examination (NDE)**," which states, in relevant part:

> The Purchaser may order NDE by an independent laboratory in addition to any examinations specified herein.  The NDE type, extent, and method shall be the same as that required for the original weld.  If the weld is defective, the laboratory costs shall be paid by the Supplier.  If the weld is not defective, the laboratory costs will be paid by the Purchaser.  Repair of defective welds and reexamination shall be at the Supplier's expense.

Contrary to DynaSteel's argument, Article Q100.7 does not govern.  The salient feature of the weld inspection costs B&V is seeking to recover is not that they involved welds, but that they were *triggered by reasonable concerns with DynaSteel's work*.  Article Q001.1.6 is the provision that governs testing caused by initial inspection failures, not Article Q100.7.  DynaSteel's reliance is misplaced.[6]

According to B&V, its direct costs for confirming the presence of the strap plates (which it claims DynaSteel failed to include in its drawings) was $9,030.00.  DynaSteel contends this amount as excessive, arguing that "it cannot be disputed that strap plates

---

[6] In its reply brief, DynaSteel claims for the first time that its position is supported by "AWS § 6.5.5," apparently referring to a standard promulgated by the American Welding Society that seems similar to Article Q100.7.  However, not only is this argument not proper for a reply brief, but this standard cannot be given any more effect than Article Q100.7 itself.  This contention lacks merit.

extend past the insulation and lagging system, which could have been easily verified in the field by one of B&V's contractors." However, DynaSteel provides no citation for this allegedly undisputed fact. DynaSteel's challenge to the reasonableness of B&V's inspection costs is an issue for trial, not on motion for summary judgment. DynaSteel is not entitled to summary judgment on this issue.

### 4. Design Change Notifications

After the contract was executed, B&V issued to DynaSteel design revisions of the ductwork through Engineering Change Notices (ECNs). However, DynaSteel failed to incorporate all of the changes, causing B&V to implement the changes at the jobsite and resulting in backcharges to DynaSteel for these costs. DynaSteel argues that it was not required to incorporate the design changes contained in the ECNs without first receiving from B&V "Purchase Order Revisions." DynaSteel's argument implicates Article 00512.9, captioned "**Purchase Order Revisions**." In relevant part, this Article states:

> Purchaser may, at any time, make changes in this Purchase Order, consisting of additions, deletions, or other modifications that Purchaser may deem desirable. If such change causes a material increase in Suppler's cost and/or time for performance, Supplier shall so notify Purchaser in writing within ten calendar days from the date of Supplier's receipt of Purchaser's notice of change, and, upon Purchaser's concurrence with Supplier's notice, an equitable adjustment in the Purchase Order Price and the time of performance shall be mutually agreed upon between the Parties. *Suppler, however, shall proceed as directed by Purchaser pending such mutual agreement. . . .* No change shall be effective in the absence of express written direction of Purchaser. *Any and all such changes shall be evidenced by a Purchase Order Revision to this Purchase Order*, executed by Purchaser's Procurement Department representative, and Supplier agrees to promptly comply therewith.

DynaSteel justifies its refusal to incorporate the design changes with the argument that if it had incorporated the design changes when they were first issued by

B&V, "DynaSteel would have taken the chance of performing the work for free." This argument is contradicted by Article 00512.9, with provides for an "equitable adjustment" in the event of "a material increase in Supplier's cost." Significantly, the contract compelled DynaSteel to "proceed as directed by Purchaser" notwithstanding the lack of an agreement on price. The fact that the change would ultimately be evidenced in a formal Purchase Order Revision was not intended to delay design modifications called for by ECNs. DynaSteel's delay in incorporating the ECNs was not justified by Article 00512.9.

DynaSteel further claims that it did not receive notice of the design changes for duct pieces until *after* they were already fabricated and shipped. B&V controverts this claim with evidence tending to show that DynaSteel received notice of the design changes prior to shipment. The jury will need to weigh the parties' conflicting evidence and determine whether DynaSteel's claim has merit.

Finally, DynaSteel argues that it should not be held liable for the full amount of corrective costs in failing to implement design changes because B&V only paid DynaSteel for the design changes it actually incorporated, not the design changes DynaSteel failed to incorporate and which were completed by B&V's subcontractors. The Court notes that the Purchase Order Revision embracing ECN-72 and ECN-123 showed an increased payment to DynaSteel of $29,573.00, much less than the $50,904.00 proposed by DynaSteel. The reduced amount "reflect[ed] [the] ECN changes actually fabricated by [DynaSteel]," rather than all the changes stated in the ECNs. However, with respect to backcharges, the contract authorized B&V to "correct such defect or nonconformity and *all costs* therefore shall be to Supplier's account." Article 00512.29.2. Inasmuch as DynaSteel's work failed to conform to applicable specifications, B&V may recover its full corrective costs under the contract. DynaSteel is not entitled to summary judgment.

### 5. Approval of Drawings

Article 01500.1 of the contract, captioned "**Technical Scope of Work**," required

DynaSteel to "[i]nstall the insulation and lagging system such that there is 2ft (two feet) clear on each side of the field splice joints and expansion joints which will be insulated in the field by others."  DynaSteel admits it did not install the insulation with the required 2-foot setback, but argues nonetheless that it should not be held liable for B&V's costs to correct the nonconformity.  The Court disagrees.

DynaSteel's argument is based on shop drawings it submitted to B&V which showed that the insulation and lagging system would be installed without the 2-foot insulation setback.  According to DynaSteel, B&V returned these drawings with "NE" noted on them.  The "NE" notation is explained in Article 500.4.2.1, captioned "**No Exceptions Noted (NE) or Received for Distribution (RD)**," which states, "Upon Supplier receipt of a submittal marked "No Exceptions Noted" . . . Supplier may proceed with its Work to the extent of and in accordance with the submittal."  Since B&V returned DynaSteel's drawing with "'No Exceptions Noted,'" DynaSteel argues it was authorized to proceed according to its drawing and that B&V either waived or should be estopped from enforcing the 2-foot insulation setback specification.

The Court rejects DynaSteel's argument.  Article Q500.4.2, captioned "**Drawing Processing**," states in relevant part, "Review or approval of drawings . . . shall in no way release the Supplier from responsibility for proper fulfillment of contract requirements nor from his liability to replace materials should they prove defective or fail to meet specified requirements."  Likewise, Article Q500.4.2.7, captioned "**Purchaser's Review**," provides:

> Purchaser's review of drawings and other submittals will cover only general conformity . . . .  Purchaser's review does not include a thorough review . . . .  Review and comment by Purchaser of Supplier's Drawings or other submittals shall not relieve Supplier of its sole responsibility to . . . supply Goods that conform to the requirements of this Purchase Order.

DynaSteel's waiver and estoppel arguments fail in light of these provisions.[7]

---

[7]  DynaSteel does not argue that B&V's corrective costs for this issue should be denied for any other reason, such as failure to provide notice or an opportunity to cure.

In its responsive suggestions, B&V requests that summary judgment be entered against DynaSteel for its liability in failing to abide by the 2-foot insulation setback. DynaSteel had an opportunity to respond to this request in its reply suggestions. Although B&V did not file a motion for summary judgment, the Court grants B&V judgment on DynaSteel's liability because there are no genuine issues of material fact and B&V is entitled to judgment as a matter of law. *See Interco Inc. v. Nat'l Surety Corp.*, 900 F.2d 1264, 1268 (8th Cir. 1990) (noting that district court may grant summary judgment to nonmoving party so long as party against whom judgment will be entered was given sufficient advance notice and adequate opportunity to demonstrate why summary judgment should be denied). B&V's damages with respect to the insulation setback will need to be proven at trial.

*6. Insulation Saturation*

Lastly, B&V alleges that DynaSteel failed to correctly install insulation on duct piece 2C-36, causing the insulation to become saturated during shipment to and storage at the jobsite. According to B&V, the saturation "caus[ed] the weight of [2C-36] in excess of the capacity of the crane," requiring B&V to incur costs in removing the insulation and then reinstalling it once the duct piece was erected.

DynaSteel does not dispute that the contract required it to install the insulation to prevent it from being damaged during shipment and to completely seal the ends of all insulation to protect the insulated ductwork during storage. Rather, DynaSteel claims the liability for the wet insulation rests with B&V and its subcontractor, AKSI. There are genuine issues of material fact regarding DynaSteel's liability for the wet insulation on 2C-36 and B&V's corrective costs. DynaSteel's request for summary judgment on this issue is denied.

III.  CONCLUSION

DynaSteel's motion for summary judgment is denied. B&V's request for partial

17

summary judgment on the issue of DynaSteel's liability for failing to abide by the 2-foot insulation setback is granted, with damages to be proven at trial.

IT IS SO ORDERED.


                                        /s/ Ortrie D. Smith
                                        ORTRIE D. SMITH, JUDGE
DATE:March 10, 2010                     UNITED STATES DISTRICT COURT